IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PLEZ JOHNSON, JR.,
        Plaintiff,

vs.

Case No. 3:04cv397/MCR/EMT

JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
        Defendant.

_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits under Title II of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.[1]

---

[1]The court may remand a case for entry of an order awarding benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Because the evidence in this case does not clearly establish disability, the court should remand for further proceedings.  *See id.* (the general rule is to reverse and remand for additional proceedings).

I.      PROCEDURAL HISTORY

This suit involves an application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (Tr. 235-37).[2]  Plaintiff filed his application for DIB on September 9, 2000, alleging an onset of disability of December 17, 1998 (*id.*).  His application was denied initially (Tr. 242-44, 246) and on reconsideration (Tr. 238-40, 245).  On January 24, 2003, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act at any time through the date of the decision (Tr. 18-29).  On September 24, 2004, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 3-5).  The Appeals Council's action made the ALJ's decision the final decision of the Commissioner and, therefore, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.     FINDINGS OF THE ALJ

On January 24, 2003, the ALJ made several findings relative to the issues raised in this appeal (Tr. 21-29).  The ALJ found that: 1) Plaintiff meets the nondisability requirements for a period of disability and DIB set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of his decision;[3] 2) Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability; 3) Plaintiff has an impairment or combination of impairments considered "severe," including residuals of multiple gunshot wounds (abdominal wall hernia (status post repair 2001) and history of bowel incontinence), post traumatic stress disorder, and limited intellectual functioning; 4) these medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; 5) Plaintiff's allegations regarding his limitations are not totally credible; 6) the ALJ carefully considered all of the medical opinions in the record regarding the severity of Plaintiff's impairments; 7) Plaintiff has the residual functional capacity ("RFC") to lift and carry twenty pounds occasionally and ten pounds

---

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on May 27, 2005 (Doc. 13).

[3] Thus, the time frame relevant to this appeal is December 17, 1998 (alleged onset) to January 24, 2003 (date last insured).

frequently and to sit or stand/walk each for six hours in an eight-hour workday, and Plaintiff has a limited, but satisfactory ability to interact with co-workers and supervisors, deal with the public, use judgment, deal with work stresses, maintain attention and concentration, and understand, remember and carry out detailed instructions; 8) Plaintiff is unable to perform any of his past relevant work; 9) Plaintiff is a "younger individual"; 10) Plaintiff has "a limited education"; 11) Plaintiff has no transferable skills from any past relevant work and/or transferability of skills is not an issue; 12) Plaintiff has the RFC to perform a significant range of light work; 13) although Plaintiff's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the national economy that Plaintiff can perform, which were identified and enumerated by the vocational expert; and 14) Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (Tr. 23, 28-29). Thus, the ALJ concluded that Plaintiff was not entitled to DIB (Tr. 29).

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d

842 (1971) (quoting <u>Consolidated Edison Co. V. NLRB</u>, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps. The steps are:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment,

the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

      A.     Personal History

At a hearing before the ALJ on December 3, 2002, Plaintiff testified as follows (Tr. 40-59). He was born on April 15, 1960, making him forty-two years old at the time of the hearing (Tr. 46). He had been married just over a year at the time of the hearing and lived with his wife in a rental house (*id.*).  He has children from a previous marriage (Tr. 54).

Plaintiff was in prison from 1987 to 1989 for selling marijuana (Tr. 52).  He returned to prison shortly after being released for stealing five dollars (Tr. 52-53).  He was released again in 1991 (Tr. 52).  He was addicted to crack cocaine and alcohol for thirteen or fourteen years, but stopped using and selling drugs and drinking alcohol when he was shot in 1998 (Tr. 58-59).

Plaintiff went to school through the eleventh grade (Tr. 48).  He cannot read, but is able to write his name and date of birth (*id.*).  He  has never had a driver's license because he is unable to pass the test (Tr. 47-48).   He was also unable to pass the test to get into the military (Tr. 49). Plaintiff worked as a commercial fisherman from the 1980's through 1998, when he stopped working due to his gunshot wounds (Tr. 49-50).

Plaintiff's wife does the grocery shopping, the housework, and the laundry, and her brother takes care of the yard (Tr. 53-54).  Plaintiff is able to dress himself slowly and attend church (Tr. 55-56).  He can only sit for fifteen to twenty minutes before he has to move around (Tr. 56-57).  He cannot stand long and gets tired when he walks (Tr. 57).  He can lift about twenty pounds (*id.*).

      B.     Relevant Medical History

Plaintiff sustained multiple gunshot wounds on December 17, 1998, the most serious being a gunshot wound to the abdomen that penetrated his small bowel and inferior vena cava (Tr. 117-20).  He underwent surgery to repair his wounds on December 17, 1998 (Tr. 119-20) and was

discharged on December 30, 1998 (Tr. 116).[4]

Plaintiff was initially seen by Michael F. Fry, M.D., on March 20, 2001 for fecal incontinence since his gunshot wound (Tr. 167-69).  Plaintiff reported that he had fecal incontinence at least two times a day (Tr. 167).  He denied any psychiatric illness or depression (Tr. 168).  On physical examination, he was alert and oriented, and his memory was intact (Tr. 169).  Dr. Fry ordered stool studies to rule out bacterial or viral causes of diarrhea, scheduled a barium enema to rule out structural or functional causes, and educated Plaintiff regarding a high-fiber diet (*id.*).

Plaintiff was seen for individual counseling on August 20, 2001 by Susan Rivazfar, M.S.W., which was his first attempt at counseling (Tr. 185-86).  He reported experiencing urges to use crack cocaine or drink whiskey and feeling depressed (Tr. 185).  He described himself as a "floater," meaning he partied and had children with whoever he could (*id.*).  He reported having seven children, but could not remember their ages (*id.*).  Plaintiff also reported getting angry to the point of exploding at his girlfriend and cursing at her (*id.*).  He reported that his memory was intact, and he denied delusions, hallucinations, and suicidal ideation (*id.*).  He spoke in a clear, calm voice and could articulate his thoughts and feelings (*id.*).  Ms. Rivazfar's diagnosis was alcohol and cocaine dependence, in full remission, and major depressive disorder (Tr. 186).  Plaintiff was given appointments with Dr. Samanta for his depression and with Denise Horton (believed to be a mental health counselor) for his depression and alcohol and drug "urges" (*id.*).

Plaintiff presented to Lakeview Center on October 16, 2001 for his appointment with staff psychiatrist, Kaberi Samanta, M.D. (Tr. 182-84).  Plaintiff denied any previous psychiatric treatment, but stated he had been in "rehab" in the past  (Tr. 182).  His main problem was that he becomes angry easily and yells and screams at his "lady friend" (*id.*).  Plaintiff stated that he could not sleep, his mind was not right, he saw things at night, and he has flashbacks of being shot (*id.*).  He felt hopeless, helpless, and worthless (*id.*).  Dr. Samanta documented that Plaintiff had childhood issues, including being left by his mother and physically abused by his grandfather when he was young (*id.*).  He has never married, but has six children from different women (*id.*).  Plaintiff reported that he attended special education until the tenth grade (Tr. 183).

---

[4]The transcript contains additional medical records pertaining to Plaintiff's ongoing intestinal problems; however, because neither party disputes the ALJ's analysis of Plaintiff's <u>physical</u> problems, the records are not summarized further in this Report and Recommendation.

Plaintiff appeared somewhat loud, became agitated easily, and got louder with pressured, rapid speech (*id.*).  He needed to be confronted frequently to calm down and talk appropriately (*id.*). He admitted to problems with anger, poor coping skills, and impulsivity (*id.*).  He had some speech impediment, and his memory was impaired for remote and recent events and somewhat patchy (*id.*). His insight was fair, and his judgment appeared to be borderline (*id.*).  Dr. Samanta's diagnosis was organic affective disorder, secondary to drugs; head injury; and alcohol and cocaine abuse/dependence, in remission (*id.*).  He planned a trial with mood stabilizers, Neurontin and Thorazine (*id.*).

C.      Other Information Within Plaintiff's Claim File

Richard W. Lucey, M.D., performed a consultative examination on October 10, 2000 (Tr. 153-56).  He noted that Plaintiff was a single forty year old male with an eleventh grade education (Tr. 153).  Plaintiff reported that he had been in good health until October 1998 when he was shot in the chest, abdomen, and shoulder (*id.*).  Since the surgery to repair his wounds, he has had intermittent problems with his bowels (*id.*).  Dr. Lucey's appraisal was gunshot wound to the abdomen with residual abdominal wall hernia and history of stool incontinence (Tr. 154).

Todd Patterson, D.O., completed a Physical RFC Assessment on February 24, 2001 (Tr. 157-64).  Dr. Patterson opined that Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; sit, stand and/or walk six hours in an eight-hour workday; and was unlimited in his ability to push and/or pull (Tr. 158).  No postural, manipulative, visual, communicative, or environmental limitations were established (Tr. 159-61).

On July 5, 2001, Plaintiff was seen by clinical psychologist John F. Duffy, Ph.D., for I.Q. and achievement testing (Tr. 176-79).  Dr. Duffy conducted a screening interview and administered the Wechsler Adult Intelligence Scale III ("WAIS III") and Wide Range Achievement Test III ("WRAT III") (Tr. 176).  Plaintiff was alert, oriented, and fairly cooperative (*id.*).  His speech was clear, and he engaged in conversation easily (*id.*).  "A good deal of effort was expended in encouraging him to answer questions clearly and directly, as he had a tendency to minimize the value of the I.Q. test questions, give off the cuff answers, and be extremely concrete." (*id.*).  Dr. Duffy went beyond the usual limits in test administration and encouraged Plaintiff to try harder to come up with answers so he could better assess his actual fund of knowledge and mental processing

abilities (*id.*).  With this in mind, Dr. Duffy felt that Plaintiff did perform to the best of his abilities on the intellectual testing (*id.*).  On the achievement testing, Dr. Duffy felt that he was persistent and appeared to perform his best (*id.*).

Plaintiff reported a long history of alcohol and cocaine dependence, but stated he stopped using both in 1998 (*id.*).  He also reported being hit over the head numerous time in fights, but could not give details about how long he may have lost consciousness (*id.*).  He did report stitches and scars on the back of his head (*id.*).  Plaintiff stated that he never handles bills because of his inability to read and has always relied on female friends to take care of such chores (Tr. 177).[5]

On the WAIS III, Plaintiff obtained the following I.Q. scores: verbal 62, performance 62, full scale 59 (*id.*).  Overall, Plaintiff scored in the mild mental retardation range of intelligence and below 99 percent of others in the general population (*id.*).  All but two of his subtest scores fell in the mentally deficient range and were more than two standard deviations below normal (*id.*).  He fell at the low end of the borderline range on two subtests involving attention to numbers and mental calculations (*id.*).  Otherwise, his knowledge of word meanings, verbal abstracting skills, reasoning skills, and mental speed in processing visual motor information were all markedly deficient (*id.*).  Dr. Duffy noted that persons with this level of intelligence usually work in unskilled labor areas (Tr. 178).

On the WRAT III, Plaintiff obtained the following scores: reading word precision < 45, spelling < 45, arithmetic 55 (*id.*).  Dr. Duffy documented that Plaintiff's academic skills are at the first and second grade level (*id.*).  Plaintiff reported that he went to school through the eleventh grade, but was always considered a slow learner (*id.*).  He was able to read and write all the letters of the alphabet correctly and read and spell some one-syllable words (*id.*).  Dr. Duffy noted that he could read the first sounds of a word correctly, but not the middle or ending sounds (*id.*).  In math, he was able to perform some one-digit multiplication, subtraction, and addition (*id.*).  He correctly carried numbers on some simple math problems (*id.*).  He was unsuccessful in working with fractions, percentages, division, and multiple-digit multiplication (*id.*).

Dr. Duffy's diagnosis was mild mental retardation (*id.*).  He noted that Plaintiff's intellectual

---

[5]In October 2000, on a form completed for the Office of Disability Determinations, Plaintiff reported paying his own bills and managing his own money (*see* Tr. 87, 89).

abilities were at a level below 99 percent of others in the general population, and his academic skills were commensurate or even lower (*id.*). Based on Plaintiff's reported history and work experience, Dr. Duffy believed that Plaintiff's intellectual level had been consistent since childhood (Tr. 178-79). Dr. Duffy opined that "[d]espite the long history of drug problems and reported repeated minor head traumas, his pattern of scores does not suggest any significant decline in abilities but rather appears most consistent with long-standing limitations in intellectual and academic skill abilities" (Tr. 179). Dr. Duffy also completed an RFC Questionnaire (Tr. 180-81). He opined that Plaintiff had marked restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and marked deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (Tr. 180). Dr. Duffy further opined that Plaintiff had marked limitations in his ability to understand, carry out, and remember instructions and to respond appropriately to supervisors and co-workers in a work setting (*id.*). He had moderate limitations in performing simple and repetitive tasks in a work setting (*id.*). Dr. Duffy documented that Plaintiff had these impairments since childhood (Tr. 181).

Frank A. Brown, Ph.D., evaluated Plaintiff on June 24, 2002 (Tr. 209-14). Plaintiff was alert and spoke clearly with a lot of expression in his voice (Tr. 209). He was quite animated and his affect showed considerable spontaneity (*id.*). He was fairly fluent in his use of language and was able to understand the interview questions (*id.*). He could keep a lengthy train of thought, but his thought processes were rather concrete (*id.*). He did not show any confusion unless trying to reason with abstract or complex ideas (*id.*). He gave no indication or history of any psychotic symptoms, such as hallucination, disorganization of thought processes, or bizarre content in his thinking (*id.*). His memory for facts about his life over both the short-term and long-term was fair, and his concentration was "decent" (*id.*).

His intellectual abilities were evaluated using the WAIS III (*id.*). He earned a verbal I.Q. of 66, a performance I.Q. of 69, and a full scale I.Q. of 65, which placed him in the mild mental retardation range (*id.*). Dr. Brown opined that while this appeared to be a fairly valid estimate of his intellectual abilities, his adjustment in life had been better than one would expect of a person functioning in this intellectual range (*id.*). Dr. Brown stated that he exhibited vocational achievement and social and daily living skills considerably better than those found in individuals

who are mildly mental retarded (*id.*).

Dr. Brown documented that Plaintiff demonstrated quite a limited range of knowledge about the world around him (*id.*).  His vocabulary was poor with formal testing, but seemed adequate for carrying on a causal conversation (*id.*).  He was fairly fluid in his use of language and was able to remember a couple of instructions at one time (Tr. 209-10).  His mathematical reasoning ability for solving problems was fair and would be sufficient for him to handle his own finances (Tr. 210).

On perceptual-motor tasks, he demonstrated limited ability to discriminate significant visual detail (*id.*).  However, he had fair success reasoning with visual information, but could have persisted better and may have had better success had he done so (*id.*).

Plaintiff's academic background was screened using the Wide Range Achievement Test - Revised (*id.*).  Plaintiff demonstrated academic skill at about the level one would expect of a person with his I.Q., with the exception that his reading may be a little poorer (*id.*).  However, it did not fall so low as to require diagnosing Plaintiff with a specific learning disability (*id.*).  Plaintiff reported that when he was in school he did not attend regularly (*id.*).  He has the reading ability to recognize common signs and labels and to read on a "Dick and Jane" level (*id.*).  His math background is sufficient for making change and solving addition, subtraction, and multiplication problems involving whole numbers (*id.*).

Dr. Brown noted that Plaintiff was taking two medications prescribed by Dr. Samanta, Neurontin ("to calm down") and Thorazine ("for stress-temper") (*id.*).  Plaintiff reported that the medications helped dramatically (*id.*).  Dr. Brown also noted that earlier in life he was "on drugs a long time," using $1000.00 of crack cocaine daily and dealing crack cocaine and marijuana (Tr. 211).  According to Dr. Brown, "[t]his 'achievement' was another indication that he doesn't function like a person who is mildly mental retarded in his daily life.  He has been too functional." (*id.*).

Plaintiff reported that he typically gets up at about 4:00 a.m. and takes care of his personal hygiene and dress (*id.*).  On a daily basis he watches television, sits on the porch to watch people pass by, and talks with his wife (*id.*).  He originally insisted that he never leaves the house, but upon further questioning admitted that on Sundays he goes to church where he helps clean the bathrooms, and he occasionally goes to the store or rides with his wife to pay bills (*id.*).  He also checks on his wife's mother and sees his children on holidays (*id.*).  He minimized his activities around the house,

originally stating that he hired someone to do them, but later admitting that he does some dusting, laundry, and dishes, and he walks in the yard for exercise (*id.*).  He stated that at times he got depressed, but it did not last a day (*id.*).  Although other records document that Plaintiff has six or seven children, he told Dr. Brown that he has four (*id.*).  Two of them were staying with him for the summer, and he went to the park with them on occasion (*id.*).

Dr. Brown stated that he would diagnose Plaintiff as being mildly mental retarded, although his life had shown more independence than one might assume in an individual with this diagnosis (*id.*).  Dr. Brown also noted that Plaintiff had symptoms of post traumatic stress disorder, but his symptoms were well-controlled by medication (*id.*).  Plaintiff also had a long history of poly-drug abuse, which was in remission (*id.*).

Finally, Dr. Brown completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) (Tr. 212-14).  Dr. Brown opined that Plaintiff had a good ability to follow rules at work and a fair ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with stresses, and maintain concentration/attention (Tr. 212).  He further opined that Plaintiff had a poor ability to understand, remember, and carry out complex job instructions; a fair ability to understand, remember, and carry out detailed, but not complex, job instructions; and a good ability to understand, remember, and carry out simple job instructions (Tr. 213).  Further, Plaintiff had a good ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability (*id.*).

V.    DISCUSSION

Plaintiff raises one issue on appeal.  Specifically, Plaintiff contends that the ALJ erred at step three of the evaluation sequence in finding that, although Plaintiff's mental retardation was "severe," it did not meet or equal Listing 12.05(C) under 20 C.F.R. Part 404, Subpt. P, Appx. 1 (Doc. 15 at 5-13).  The Commissioner asserts that substantial evidence supports the ALJ's finding that Plaintiff's mental impairment did not meet or equal Listing 12.05(C) (Doc. 16 at 3-8).

The listings for mental disorders are arranged in nine diagnostic categories, including mental retardation, which is section (or "listing") 12.05.  Listing 12.05 contains an introductory paragraph,

with the diagnostic description for mental retardation,[6] and four sets of criteria (paragraphs A through D). If a claimant's impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, the impairment "meets the listing." An individual meeting or equaling the listing could not reasonably be expected to engage in gainful work activity. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1; 20 C.F.R. § 404.1525.

Paragraphs A and B of Listing 12.05 contain criteria that describe disorders severe enough to establish disability without any additional assessment of functional limitations. For paragraph C, however, the degree of functional limitation imposed by the impairment must be assessed to determine whether it significantly limits a claimant's physical or mental ability to do basic work activities (i.e., is a "severe" impairment(s), as defined in § 404.1520(c)). If the additional impairment(s) does not cause limitations that are "severe" as defined in § 404.1520(c), the additional impairment(s) cannot be found to impose "an additional and significant work-related limitation of function," even if a claimant is unable to do past work because of the unique features of that work.

The Eleventh Circuit has held that a claimant meets Listing 12.05(C) if he meets the diagnostic description in the introductory paragraph, and the following are shown: 1) a valid I.Q. score of 60 to 70 inclusive (it is undisputed that Plaintiff has scores in this range), and 2) a physical or other mental impairment imposing additional and significant work-related limitation of function. Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992). While a valid I.Q. score below 70 may satisfy the first prong of the listing requirement, the Eleventh Circuit held in Popp v. Heckler, 779 F.2d 1497 (11th Cir. 1986) that it is entirely appropriate for an ALJ to examine evidence other than I.Q. test scores to determine whether a claimant is mentally retarded. In Popp, the claimant had a performance I.Q. score of 69, but had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various jobs that were inconsistent with his claim of mental retardation. Thus, the ALJ was justified in disregarding the test result. This holding was echoed in Lowery, 979 F.2d at 837, where the Eleventh Circuit found that a valid I.Q. score need not be conclusive of mental retardation when the score is inconsistent with other evidence of record.

---

[6]The diagnostic description states, "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, Appx. 1, Listing 12.05.

In the instant case, the ALJ evaluated Plaintiff's mental impairment, generally, as follows: 1) by discussing and discounting Dr. Duffy's report, which documents I.Q. scores of 62, 62, and 59, and contains Dr. Duffy's opinion that Plaintiff's deficits have remained constant throughout his life; 2) by noting Plaintiff's educational background, which, in the ALJ's opinion, showed no "significant school failures" or a learning disability; 3) by noting Plaintiff's past work experience as a commercial fisherman, which is classified as semi-skilled work; 4) by noting Plaintiff's statement that he could not work due only to physical problems, not mental problems; 5) by discussing Dr. Brown's report, which documents I.Q. scores of 66, 69, and 65, but which also reveals Dr. Brown's opinion that those scores under-represent Plaintiff's abilities; and finally 6) by reciting Plaintiff's daily activities (Tr. 23).   The ALJ concluded the discussion as follows: "Therefore, it appears the 'B' criteria of section 12.05 and the 'B' and 'C' criteria of section 12.06 have not been satisfied." (Tr. 24).[7]

The ALJ's opinion, however, provides no clear road map for this court to follow.  First, the ALJ did not specifically state whether Plaintiff satisfies the diagnostic criteria in the introductory paragraph, which must be addressed in connection with the evaluation of an impairment under section A, B, C, *or* D of Listing 12.05.  Second, although the ALJ specifically found that Plaintiff failed to meet Listing 12.05(B), he did not mention the paragraph B criteria, nor discuss pertinent regulations of the Commissioner regarding any analysis under that section.  Third, the ALJ failed to mention Listing 12.05(C), or make any specific findings regarding the paragraph C criteria, as he clearly should have in light of the evidence in this case.  Fourth, although the ALJ discussed the six factors listed above, he did not explain which factors he relied upon in making particular findings (e.g., whether they were used in deciding that Plaintiff did not meet the diagnostic description, that Plaintiff did not meet the paragraph B criteria of Listing 12.05, or that Plaintiff did not meet Listing 12.06).  Although the court recognizes that some factors are pertinent to more than one finding, the court cannot provide a rationale for the ALJ's decision; his reasoning must be clear from his written opinion, but it is not in this case.  Moreover, this court cannot resolve the only disputed issue in this appeal, as the parties are asking the court to determine the propriety of a decision made by the ALJ

---

[7] Contrary to the parties' positions, the ALJ did not specifically find that Plaintiff's mental impairment failed to meet Listing 12.05(C).  He found only that it failed to meet Listing 12.05(B), 12.06(B), and 12.06(C) (*see* Tr. 24).

(i.e, regarding Listing 12.05(C)) that the ALJ did not make.  Accordingly, this case should be remanded for further proceedings.

Upon remand, the ALJ should consider the following:

A.    Diagnostic Description/Introductory Paragraph (Listing 12.05):  The ALJ should specifically address the diagnostic description ("[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22"), state whether Plaintiff meets it, and identify the factors he has relied upon in reaching this decision.

Plaintiff contends he meets the diagnostic description, including onset of the impairment prior to age 22, and in support cites to Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir. 2001), which held that I.Q. tests create a presumption of a fairly constant I.Q. throughout life, absent evidence of sudden trauma that can cause retardation (Doc. 15 at 13).  The Commissioner, however, notes that the presumption is rebuttable, the burden is on the Commissioner to rebut it, and the Commissioner can do so by presenting evidence of a daily life that is inconsistent with a diagnosis of mental retardation.  Hodges, 276 F.3d at 1269; Whetstone v. Barnhart, 263 F.Supp.2d 1318, 1325 (M.D. Ala. 2003).

The Commissioner contends the evidence rebuts the presumption of "a fairly constant I.Q. throughout life," noting that Plaintiff was able to read and write the letters of the alphabet and perform some one-digit multiplication, subtraction, and addition; he could read on a "Dick and Jane" level; he showed no confusion unless trying to reason with abstract or complex ideas; he was fairly fluent in his use of language and was able to understand interview questions; and he could articulate thoughts and feelings (Doc. 16 at 5).  However, the ALJ did not mention these factors.  Moreover, some of the factors set forth by the Commissioner (i.e., his fluent use of the language, ability to understand interview questions, and ability to articulate thoughts and feelings) were observed by Dr. Brown in June 2002 (see Tr. 209-11) and do not necessarily relate back to Plaintiff's life prior to age 22.  Similarly, although the ALJ recognized that all of Plaintiff's I.Q. scores were below 70, he noted their inconsistency with Plaintiff's daily life, citing Plaintiff's current daily activities (e.g., housework, walking for exercise, going to church, etc. (Tr. 23)), not Plaintiff's activities prior to age

22.

The ALJ did correctly note Dr. Brown's belief that Plaintiff's "adjustment in life has been better than one would expect of a person functioning in this intellectual range," and his belief that Plaintiff "does not function like a person who is mildly mentally retarded in his daily life" (Tr. 23, 209-11).  However, Dr. Duffy's records are inconsistent with Dr. Brown's, and Dr. Duffy's records clearly support a finding that Plaintiff's mental impairment existed before age 22, based not only upon Plaintiff's I.Q. scores (i.e., 62, 62, 59) and presumption of a fairly constant I.Q. throughout life, but also upon Dr. Duffy's opinion that Plaintiff's "intellectual level has been consistent since childhood . . . [and] his pattern of scores does not suggest any significant decline in abilities but rather appears most consistent with long standing limitations in intellectual and academic skill abilities" (Tr. 178-79).

The ALJ resolved the conflicting opinions of Dr. Duffy and Dr. Brown by declining to give controlling weight to Dr. Duffy's report, noting that Dr. Duffy's conclusions were inconsistent with Plaintiff's education, work history, and self-report to Dr. Duffy that he considered himself disabled because of physical problems only (Tr. 23).

Regarding Plaintiff's education, the ALJ noted that Plaintiff attended school through the eleventh grade (i.e., prior to age 22) in special education classes, but "there is no indication of significant school failures or of a learning disability" (Tr. 23, 75, 153).  This statement is troubling, as it is difficult to imagine a greater school failure than illiteracy after completion of the tenth or eleventh grade.  Additionally, the fact that Plaintiff was in special education classes indicates to this court that he indeed experienced learning difficulties.  Thus, this court concludes that this factor is not supported by the record and should not be considered by the ALJ in deciding whether to discredit the opinions of Dr. Duffy.

The ALJ also considered Plaintiff's work history, concluding that it was not consistent with a mentally retarded  individual (Tr. 22-23).  Plaintiff reported working as a commercial fisherman for approximately eighteen years (Tr. 49, 78-79),[8] and the vocational expert classified that work as semi-skilled (Tr. 60).  The regulations define semi-skilled work as:

---

[8]This includes work performed before the age of 22 because Plaintiff reported beginning employment as a commercial fisherman in 1980 or 1981 (Tr. 78), and he was born in 1960 (Tr. 46).

> Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

20 C.F.R. § 404.1568(b).

Thus, Plaintiff's history of semi-skilled work, as defined above, indeed indicates functional capacities greater than that suggested by his I.Q. scores. "'The regulations indicate, in the context of mental retardation, that an ability to hold a job is 'particularly useful in determining the individual's ability or inability to function in a work setting.'" *See* Whetstone, 263 F.Supp.2d at 1326; (citing Williams v. Sullivan, 970 F.2d 1178, 1184-86 (3d Cir. 1992) (quoting 20 C.F.R. § 404, Subpt. P, Appx. 1, § 12.00(D))). In Williams, the Third Circuit found that despite a verbal I.Q. score of 66, the fact that claimant worked for twenty-two years at a steel drum factory refuted his claim of deficient intellectual functioning before age 22. 970 F.2d at 1184-86. Similarly, Plaintiff held a semi-skilled job for approximately eighteen years. Thus, this factor contains substantial support in the record.

Finally, the ALJ considered Plaintiff's unequivocal statement that only physical problems limited his ability to work and caused him to discontinue his eighteen-year career as a commercial fisherman, not his mental retardation (Tr. 78, 99). On September 9, 2000, Plaintiff reported that he had never been hospitalized for any mental problems, had never been treated by a mental health professional, and that "only physical problems limited his ability to work" (Tr. 99). On February 20th (year unknown, believed to be 2001), Plaintiff "confirmed once again that he is not working strictly because of physical conditions" and that no secondary mental impairment affects him (*id.*). Moreover, Plaintiff testified on December 3, 2002 at his hearing before the ALJ that he stopped working due to the effects of his gunshot wounds (Tr. 49), not because of problems related to his mental retardation. Thus, this factor also has ample support in the record.

Upon remand, it is recommended that the ALJ reconsider the opinions of Dr. Brown and Dr. Duffy. If the ALJ again decides to discredit the opinion of Dr. Duffy, he should do so only on the basis of factors with substantial support in the record.

B.      Paragraph B Criteria of Listing 12.05: The ALJ should specifically address the paragraph B criteria ("[a] valid verbal, performance, or full scale I.Q. of 59 or less").  Although the ALJ specifically found that Plaintiff did not meet this listing, his conclusion may or may not be correct.  It would appear that the ALJ again discredited Dr. Duffy's report in reaching this conclusion because Paragraph B establishes disability, with no additional assessment of functional limitations (assuming the diagnostic description is met), if a claimant has a valid verbal, performance, or full scale I.Q. of 59 or less.  Using the Wechsler series, Dr. Duffy's I.Q. testing revealed the following scores: verbal 62, performance 62, and full scale 59.  The Commissioner's regulations state, "where more than one I.Q. is customarily derived from the test administered, e.g., where verbal, performance, and full scale I.Q.s are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. § 404, Subpt. P, Appx. 1, § 12.00(D)(6)(c).  Thus, the record supports a finding of mental retardation under Listing 12.05(B) because of Plaintiff's full scale I.Q. score.  If Dr. Duffy's report was properly discounted, Plaintiff would not meet the "B" criteria; however, this court has concluded that the ALJ relied upon an impermissible factor in rejecting the report.  Moreover, although the ALJ recited Plaintiff's I.Q. scores, he did not mention the Commissioner's regulations requiring the use of Plaintiff's lowest I.Q. score in considering an impairment under Listing 12.05; therefore, this court cannot determine whether the ALJ conducted a proper analysis.  Upon remand, the ALJ should clarify whether he considered the regulations concerning the lowest I.Q. score and reconsider the propriety of discounting Dr. Duffy's report.

C.      Paragraph C of Listing 12.05: The ALJ should specifically address the paragraph C criteria ("[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function").  As noted above, all of Plaintiff's I.Q. scores fell below 70, yet the ALJ did not discuss Listing 12.05(C).  Upon remand, the ALJ should analyze Plaintiff's mental retardation under Paragraph C, noting the Commissioner's acknowledgment that Plaintiff satisfies the second Lowrey prong (i.e., that Plaintiff has a physical or other mental impairment imposing additional and significant work-related limitation of function) (see Doc. 16 at 7).

Based upon the foregoing, this court cannot affirm the ALJ's ultimate conclusion that

Plaintiff was "capable of making a successful adjustment to work that exists in significant numbers in the national economy" (Tr. 27), although the conclusion has support in the record. According to the vocational expert, the available work (i.e., at least one-thousand jobs in the region and "tens of thousands of jobs" in the nation) includes jobs as a filter assembler, small parts assembler, and module assembler (Tr. 27, 61). Despite Plaintiff's limitations, the evidence in the record does not suggest to this court that Plaintiff is incapable of performing the work suggested by the Commissioner. Even Dr. Duffy, whose report was rejected by the ALJ, opined that persons with Plaintiff's level of intelligence "are best suited for unskilled labor jobs which are concrete and simple" (Tr. 179). The problem, however, is that the court cannot accept the ALJ's ultimate conclusion based upon a belief that it is accurate, or that it would have been affirmed had the ALJ explained himself better in a different opinion; the court can only affirm if satisfied that proper legal standards were applied. Moreover, the parties are asking this court to decide whether the ALJ's decision under Listing 12.05(C) should be affirmed, when the ALJ made no such decision and failed to even address the issue. This quagmire leaves the court with no option other than recommending a remand for further proceedings.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this 21st day of February 2006.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

Case No. 3:04cv397/MCR/EMT